Adam D. Brumm, Esq.  SBN#257906
Eden Environmental Defenders
1520 E. Covell Blvd, Suite B5-611
Davis, CA  95616
Telephone: (800) 545-7215, Extension 906
Email:  adam@edendefenders.org


Attorneys for Plaintiff
CENTRAL VALLEY EDEN ENVIRONMENTAL DEFENDERS

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CENTRAL VALLEY EDEN ENVIRONMENTAL DEFENDERS, LLC, a California limited liability company, <br><br> Plaintiff, <br><br> vs. <br><br> ACM MACHINING, INC., a California corporation; LUIS ALFRED BALBACH, an individual; PHILLIP McWILLIAMS, an individual; and DOES 1-10, inclusive, <br><br> Defendants. | **COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF, CIVIL PENALTIES AND REMEDIATION** <br><br> **(Federal Water Pollution Control Act, 33 U.S.C. §§1251 et seq.)** |

Plaintiff CENTRAL VALLEY EDEN ENVIRONMENTAL DEFENDERS, LLC

("EDEN") hereby brings this civil action pursuant to the Federal Water Pollution Control Act,

also known as the Clean Water Act ("CWA"), 33 U.S.C. §§ 1251 *et seq*.

### INTRODUCTION

1.      This action is a citizen suit for injunctive relief, declaratory relief, civil

penalties, and remediation against Defendants for current and ongoing violations of the

National Pollutant Discharge Elimination System ("NPDES") permit requirements of the CWA.

2.      On or about September 10, 2021, EDEN provided a Notice of Defendants' violations of the CWA to the (1) Administrator of the United States Environmental Protection Agency ("EPA"), (2) EPA's Regional Administrator for Region Nine, (3) Executive Director of the State Water Resources Control Board ("State Board") and (4) to Defendants, including a copy delivered to the Facility Manager of Defendant ACM MACHINING, INC. by certified mail, at 11390 Gold Dredge Way, Rancho Cordova, California ("the Facility"), as required by the CWA. *See* 33 U.S.C. § 1365(b)(1)(A).

3.      A copy of EDEN's Notice of Intent to Sue is attached hereto as Exhibit "A" and incorporated herein by reference.

4.      More than sixty days have passed since EDEN's Notice was properly and lawfully served on Defendants, the State Board, and the Regional and National EPA Administrators.  EDEN is informed and believes, and thereupon alleges, that neither the National EPA, nor the State of California has commenced or is diligently prosecuting a court action to redress the violations alleged in this complaint. This action's claim for civil penalties is not barred by any prior administrative penalty under section 309(g) of the CWA, 33 U.S.C. § 1319(g).

### JURISDICTION, VENUE AND INTRADISTRICT ASSIGNMENT

5.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question), and 33 U.S.C. § 1365(a) (CWA citizen suit jurisdiction). The relief requested is authorized pursuant to 28 U.S.C. §§ 2201-2202 (declaratory relief), 33 U.S.C. §§ 1319(b), 1365(a) (injunctive relief), and 33 U.S.C. §§ 1319(d), 1365(a) (civil penalties).

6.     The Permit under which this case arises is a Federally required permit based upon California state substantive law.  (*Southern California Alliance of Publicly Owned Treatment Works v. U.S. Environmental Protection Agency* (9th Cir. 2017), 853 F.3d 1076; *Dept. of Finance v. Commission on State Mandates,* 1 Cal.5th 749 (2016)).

7.     By its express language, a violation of the State permit constitutes a per se violation of the Federal Clean Water Act.  (*See* California's Industrial General Permit Order 2014-0057 DWQ, NPDES Order No. CAS000001, Section XXI.A).

8.     Venue is proper under 28 U.S.C. §§ 1391(b)(1), (2) because Defendants reside in and the events or omissions giving rise to EDEN's claims occurred in this District. Venue is also proper under 33 U.S.C. § 1365(c)(1) because the Facility's CWA violations have occurred and are occurring within this Federal District.

## PARTIES

9.     Plaintiff CENTRAL VALLEY EDEN ENVIRONMENTAL DEFENDERS, LLC ("EDEN") is an environmental membership group organized under the laws of the State of California as a limited liability company.

10.     EDEN's organizational purpose is the protection, preservation and enhancement of California's waterways.  EDEN's mission is implemented by enforcing the provisions of the Federal Clean Water Act and California's Industrial General Permit, as well as by seeking redress from environmental harms caused by Industrial Dischargers who pollute the Waters of the United States, through community education and citizen suit enforcement when necessary.

11.     EDEN's members donate their time and money resources to protect, enhance, and assist in the preservation and restoration of rivers, creeks, streams, wetlands, vernal pools, and their tributaries located in California.

12.     EDEN has members throughout Northern California.  Some of EDEN's members reside and work the Lower Sacramento River, which is the "Receiving Waters" for Defendant ACM MACHINING's Facility storm water run-off. They use those waters and their watersheds for surfing, kayaking, camping, cycling, recreation, sports, fishing, swimming, hiking, photography, nature walks and scientific study.  Their use and enjoyment of these natural resources have been and continue to be adversely impaired by Defendants' failure to comply with the procedural and substantive requirements of the California Industrial General Permit and Federal Clean Water Act.

13.     EDEN has standing as an association to bring this suit against Defendants, as at least one of EDEN's current members is experiencing continuous and ongoing harm that is particular to him or her as a specific result of Defendants' violations of the CWA, and the resulting adverse effects to the environment and the Receiving Waters downstream from the Facility; experiencing such harm since at least the date that EDEN provided Defendants with a 60-day Notice of Intent to Sue.

14.     Specifically, the individual member(s) who are experiencing harm from Defendants' violations of the CWA are reluctant to utilize the Receiving Waters downstream from the Facility as specified in Paragraph 12, above, due to the pollution caused by Defendants' environmental violations that EDEN's members believe has entered into the Facility's Receiving Waters. The aesthetic and recreational interests of these members are therefore adversely impacted.

15.     Defendants' ongoing violations of the General Permit and the CWA have and will continue to cause irreparable harm to EDEN and certain of its current members.  The relief requested will redress the ongoing injury in fact to EDEN and its members.  Litigation of the

asserted claims and the relief requested in this Complaint will not require the participation in this lawsuit of individual members of EDEN.

16. EDEN is informed and believes, and on such information and belief alleges, that Defendant ACM MACHINING, INC. ("ACM MACHINING" or "Facility"), located at 11390 Gold Dredge Way in Rancho Cordova, California, was formed on or about March 8, 1996, as a California corporation, and is identified in the Regional Water Board's records as the Industrial General Permit applicant and operator of the Facility.

17. EDEN is informed and believes, and on such information and belief alleges, that Defendant LUIS ALFRED BALBACH is the Chief Executive Officer of Defendant ACM MACHINING, according to documents on file with the California Secretary of State.

18. EDEN is informed and believes, and on such information and belief alleges, that Defendant PHILLIP McWILLIAMS is the Legally Responsible Person ("LRP") for the Facility according to documents on file with the Regional Water Board.

## STATUTORY BACKGROUND

19. Congress declared that the Federal Clean Water Act was designed to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters" through federal and state cooperation to develop and implement "programs for preventing, reducing, or eliminating the pollution of navigable waters and ground waters." *See* 33 U.S.C. §§ 1251(a), 1252(a).

20. Section 301(a) of the Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States, unless such discharge is in compliance with various enumerated sections of the Act. Among other things, Section 301(a) prohibits discharges not

authorized by, or in violation of, the terms of a National Pollutant Discharge Elimination System ("NPDES") permit issued pursuant to Section 402 of the Act, 33 U.S.C. § 1342.

21.     Section 402(p) of the Act establishes a framework for regulating municipal and industrial storm water discharges under the NPDES program. *See* 33 U.S.C. § 1342(p). States with approved NPDES permit programs are authorized by Section 402(p) to regulate industrial storm water discharges through individual permits issued to dischargers or through the issuance of a single, statewide general permit applicable to all industrial storm water dischargers. *See* 33 U.S.C. § 1342(p).

22.     Pursuant to Section 402 of the Act, 33 U.S.C. § 1342, the Administrator of the United States Environmental Protection Agency has authorized California's State Water Board to issue NPDES permits including general NPDES permits in California.

General Permit

23.     The State Water Board elected to issue a statewide general permit for industrial storm water discharges. The State Water Board originally issued the General Permit on November 19, 1991 and modified it on September 17, 1992.   The State Water Board reissued the General Permit on April 17, 1997, and again on April 1, 2014 (the "2015 Permit" or "General Permit"), pursuant to Section 402(p) of the Clean Water Act, 33 U.S.C. § 1342(p). The 1997 Permit was in effect between 1997 and June 30, 2015.  The 2015 Permit went into effect on July 1, 2015.  The 2015 Permit maintains or makes more stringent the same requirements as the 1997 Permit.

24.     On November 16, 2018, the State Water Board adopted a revised General Permit under Order No. 2018-XXXX-DWQ, which technically became effective on July 1, 2020.

However, the 2018 Revisions have not officially been finalized or certified by the Clerk of the State Water Board as of the date of this Complaint.

25.     In order to discharge storm water lawfully in California, industrial dischargers must comply with the terms of the General Permit or have obtained and complied with an individual NPDES permit. *See* 33 U.S.C. § 1311(a).

26.     The General Permit contains several prohibitions. Effluent Limitation V(A) of the General Permit requires dischargers to reduce or prevent pollutants in their storm water discharges through implementation of the Best Available Technology Economically Achievable ("BAT") for toxic and nonconventional pollutants and the Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants.  Discharge Prohibition III(C) of the General Permit prohibits storm water discharges and authorized non-storm water discharges that cause or threaten to cause pollution, contamination, or nuisance.

27.     Receiving Water Limitation VI(B) of the General Permit prohibits storm water discharges to any surface or ground water that adversely impact human health or the environment. Both the Receiving Water Limitation VI(A) and Discharge Prohibition III(D) of the Permit prohibit storm water discharges causing or contributing to an exceedance of any applicable water quality standard contained in Statewide Water Quality Control Plan, or the Regional Board's Basin Plan.

28.     In addition to absolute prohibitions, the General Permit contains a variety of substantive and procedural requirements that Dischargers must meet.  Facilities discharging, or having the potential to discharge, storm water associated with industrial activity, and who have not obtained an individual NPDES permit, must apply for coverage under the State's General

Permit by filing a Notice of Intent to Comply ("NOI").  Dischargers have been required to file NOIs since March 30, 1992.

29.     Dischargers must develop and implement a Storm Water Pollution Prevention Plan ("SWPPP"). The SWPPP must describe storm water control facilities and measures that comply with the BAT and BCT standards.  The objective of the SWPPP requirement is to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges and authorized non-stormwater discharges from the facility, and to implement best management practices ("BMPs") to reduce or prevent pollutants associated with industrial activities in storm water discharges and authorized non-storm water discharges. *See* General Permit § X(C). These BMPs must achieve compliance with the General Permit's effluent limitations and receiving water limitations, including the BAT and BCT technology mandates.

30.     To ensure compliance with the General Permit, the SWPPP must be evaluated and revised as necessary. *See* General Permit § X(B).

31.     Failure to develop or implement an adequate SWPPP, or to update or revise an existing SWPPP as required, is a violation of the General Permit. *See* General Permit Fact Sheet § I(1).

32.     Sections X(D) – X(I) of the General Permit set forth the requirements for a SWPPP. Among other requirements, the SWPPP must include; a pollution prevention team, a site map, a list of significant materials handled and stored at the site, a description of potential pollutant sources, an assessment of potential pollutant sources, and a description of a specific mandatory set of minimum BMPs to be implemented at the facility that will reduce or prevent pollutants in storm water discharges, as well as authorized non-stormwater discharges.

33.     The General Permit further requires dischargers to implement and maintain, to the extent feasible, any one or more of the following advanced BMPs necessary to reduce or prevent discharges of pollutants in industrial storm water discharges: exposure minimization BMPs, storm water containment and discharge reduction BMPs, treatment control BMPs, and other advanced BMPs.  *See* General Permit § X(H)(2).  Failure to implement advanced BMPs as necessary to achieve compliance with either technology or water quality standards is a violation of the General Permit.

34.     The General Permit also requires that the SWPPP include BMP Descriptions and a BMP Summary Table. *See* General Permit §§ X(H)(4), (5).

35.     The General Permit requires dischargers to develop and implement an adequate written Monitoring and Reporting Program. The primary objective of the Monitoring and Reporting Program is to detect and measure the concentrations of pollutants in a facility's discharge to ensure compliance with the General Permit's discharge prohibitions, effluent limitations, and receiving water limitations.

36.     As part of their monitoring program, Dischargers must identify all storm water discharge locations that produce a significant storm water discharge, evaluate the effectiveness of BMPs in reducing pollutant loading, and evaluate whether pollution control measures set out in the SWPPP are adequate and properly implemented.

37.     Section XI(B) of the General Permit requires that Dischargers collect and analyze storm water samples from two Qualifying Storm Events ("QSEs") during the first half of each reporting year (July 1 to December 31) and two QSEs during the second half of each reporting year (January 1 to June 30), and that the samples be collected from all outfalls identified in the Facility SWPPP.

38.     Under General Permit § XI(B)(2), a QSE is a precipitation event that produces a discharge for at least one drainage area and is preceded by 48 hours with no discharge from any drainage area.

39.     Once the storm water samples have been collected, the General Permit requires that the Discharger deliver the samples to a qualified laboratory for analysis within 48 hours of collection (General Permit, Attachment H) and upload the resulting laboratory reports into the Stormwater Multiple Application and Report Tracking System ("SMARTS"), within 30 days from receipt of the report.  *See* General Permit § XI(B)(4).

40.     Under General Permit § XI(A), these facilities are also required to make monthly visual observations of storm water discharges. The visual observations must represent the quality and quantity of the facility's storm water discharges from the storm event.

41.     The General Permit requires operators to conduct an Annual Comprehensive Facility Compliance Evaluation ("Annual Evaluation") that evaluates the effectiveness of their current BMPs and the need for additional BMPs based on visual observations and sampling and analysis results. *See* General Permit § XV.

42.     Under General Permit § XI(B)(6)(c), these facilities must analyze storm water samples for pH, oil & grease and total suspended solids, as well as additional parameters indicated in the Permit by facility type and those parameters identified by the Discharger on a facility-specific basis. These measurements are intended to serve as indicators for the presence of all industrial pollutants identified in the pollutant source assessment.

43.     The US EPA has established Parameter Benchmark Values as guidelines for determining whether a facility discharging industrial storm water has implemented the requisite BAT and BCT. These benchmarks represent pollutant concentrations at which a storm water

discharge could potentially impair, or contribute to impairing water quality, or affect human health from ingestion of water or fish.

44.     The Numeric Action Levels ("NALs") in the General Permit are derived from these benchmarks. The Permit incorporates annual NALs, which are derived from the 2008 Multi-Sector General Permit ("MSGP") benchmark values, and instantaneous maximum NALs, which are derived from a Water Board dataset.

45.     The following annual NALs have been established under the General Permit for pollution parameters applicable to the Facility: pH – 6.0 - 9.0 standard units ("SU"); total suspended solids ("TSS") – 100 mg/L; oil & grease ("O&G") – 15 mg/L; Iron – 1.0 mg/L, Nitrite + Nitrate as Nitrogen --.68 mg/L, Zinc --.26 mg/L, Aluminum – .75 mg/L, Lead – .262 mg/L, Cadmium -- .0053 mg/L and Silver -- .0183 mg/L.

46.     An exceedance of an annual NAL occurs when the average of all samples obtained for an entire facility during a single reporting year is greater than a particular annual NAL. The reporting year runs from July 1 to June 30.  An instantaneous maximum NAL exceedance occurs when two or more analytical results from samples taken for any single parameter within a reporting year exceed the instantaneous maximum NAL value (for TSS and O&G) or are outside of the instantaneous maximum NAL range for pH.  *See* General Permit § XII(A).

47.     When a discharger exceeds an applicable NAL, it is elevated to "Level 1 Status," which requires a revision of the SWPPP and additional BMPs. If a discharger exceeds an applicable NAL while in Level 1 Status, their facility will be elevated to "Level 2 Status". *See* General Permit § XII(C).

48.     For Level 2 Status, a discharger is required to submit an Action Plan requiring demonstration of either additional BMPs to prevent exceedances, a determination that the exceedance is solely due to non-industrial pollutant sources, or a determination that the exceedance is solely due to the presence of the pollutant in the natural background.  *See* General Permit § XII(D).

49.     Section XVI(A) of the General Permit requires that all Dischargers must certify and submit via SMARTS an Annual Report no later than July 15th following each reporting year using the standardized format and checklists provided in the SMARTS database.

50.     Furthermore, Section XXI(L) of the General Permit provides that all documents submitted to SMARTS, including SWPPPs and Annual Reports, be certified by the legally responsible party or duly authorized representative of the Facility, with the following certification:

> "I certify under penalty of law that this document and all Attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted. Based on my inquiry of the person or persons who manage the system or those persons directly responsible for gathering the information, to the best of my knowledge and belief, the information submitted is true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations."

51.     Section XXI(N) of the General Permit provides that any person who knowingly makes any false material statement, representation, or certification in any record or other document submitted or required to be maintained under the General Permit, including reports of compliance or noncompliance shall upon conviction, be punished by a fine of not more than $10,000, or by imprisonment for not more than two years, or by both.  *See also* Clean Water Act § 309(c)(4).

The Central Valley Region Basin Plan

52.     The Regional Board has identified beneficial uses of the Central Valley Region's waters and established water quality standards for the Sacramento River, its tributaries, and the Sacramento-San Joaquin Delta in "The Water Quality Control Plan ("Basin Plan") for the California Regional Water Quality Control Board, Central Valley Region – The Sacramento River Basin and The San Joaquin River Basin"; generally referred to as the Basin Plan, and also the "Water Quality Control Plan for the San Francisco Bay/Sacramento-San Joaquin Delta Estuary".

53.     The beneficial uses of these waters include, among others, domestic and municipal supply, water contact recreation, non-contact water recreation, wildlife habitat, warm and cold freshwater habitat, and fish spawning. The non-contact water recreation use is defined as "uses of water for recreational activities involving proximity to water, but where there is generally no body contact with water, nor any likelihood of ingestion of water". These uses include, but are not limited to; picnicking, sunbathing, hiking, camping, boating, hunting, sightseeing, or aesthetic enjoyment in conjunction with the above activities.

54.     The Basin Plan includes a narrative toxicity standard which states that all waters shall be maintained free of toxic substances in concentrations that produce detrimental physiological responses in human, plant, animal, or aquatic life.

55.     The Basin Plan provides that water shall not contain floating material in amounts that cause nuisance or adversely affect beneficial uses.

56.     The Basin Plan provides that water shall be free of discoloration that causes nuisance or adversely affects beneficial uses.

57.     The Basin Plan provides that waters shall not contain suspended materials in concentrations that cause nuisance or adversely affect beneficial uses.

58.     The Basin Plan also prohibits the discharges of oil and grease, stating that waters shall not contain oils, greases, waxes, or other materials in concentrations that cause nuisance, result in a visible film or coating on the surface of the water or on objects in the water, or otherwise adversely affect beneficial uses.

59.     The Basin Plan provides that at a minimum, water designated for use as domestic or municipal supply (MUN) shall not contain concentrations of chemical constituents in excess of the maximum contaminant levels (MCLs) specified in the following provisions of Title 22 of the California Code of Regulations, which are incorporated by reference into this plan: Tables 64431-A (Inorganic Chemicals) and 64431-B (Fluoride) of Section 64431, Table 64444-A (Organic Chemicals) of Section 64444, and Tables 64449-A (Secondary Maximum Contaminant Levels-Consumer Acceptance Limits) and 64449-B (Secondary Maximum Contaminant Levels-Ranges) of Section 64449.

60.     Title 22 of the California Code of Regulations provides a MCL for Aluminum of 1.0 mg/L, .01 mg/L for Cadmium, and .05 mg/L for Lead.

61.     The Basin Plan provides that the pH shall not be depressed below 6.5 nor raised above 8.5; that Iron levels not exceed .30 mg/L; that Zinc not exceed .10 mg/L; and that Cadmium not exceed .00022 mg/L.

62.     The Basin Plan requires that waters shall be free of changes in turbidity that cause nuisance or adversely affect beneficial uses.

Citizen Suit Provision of the CWA

63.     Under the CWA, any citizen may commence a civil action against any person who is alleged to be in violation of an effluent standard or limitation under the CWA or an Order issued by a State with respect to such a standard or limitation. *See* 33 U.S.C. §1365(a)(1). No action may be commenced prior to sixty days after the plaintiff has given notice of the alleged violation (i) to the Administrator of the EPA, (ii) to the State in which the alleged violation occurs, and (iii) to any alleged violator of the standard, limitation, or order. *See* 33 U.S.C. § 1365(b)(1)(A).  By including a citizen suit provision in the CWA, Congress ensured that the purposes and requirements of the CWA would be enforced by Agencies of the United States Government, or, by concerned citizens.

64.     In furtherance of the water preservation goals established by the CWA, the citizen suit provision confirms the District Court's jurisdiction to apply civil penalties under section 1319(d).  *See* 33 U.S.C. § 1365(a). Section 1319(d) of the CWA declares that any person who violates any permit condition or limitation implementing any of such sections in an NPDES permit shall be subject to a civil penalty not to exceed $46,192 per day for each violation occurring before November 2, 2015, and $51,570.00 per day per violation for violations occurring after November 2, 2015. *See* 33 U.S.C. § 1319(d). *See also* 40 C.F.R. § 19.4. *See also* § General Permit XXI.Q.1.

65.     Violations of provisions of the General Permit, including those detailed below, constitute violations of the CWA and are subject to civil penalties. *See* General Permit § XXI. *See also* 33 U.S.C. §§ 1319(d), 1342. *See also* 40 C.F.R. §§ 19.1-19.4.

**FACTUAL ALLEGATIONS GIVING RISE TO CLAIMS**

66.     Defendant ACM MACHINING fabricates metal parts for the oil, gas and automotive industries.  EDEN is informed and believes that the Facility falls under the Standard Industrial Classification ("SIC") Code 3499.

67.     EDEN is informed and believes that ACM MACHINING stores industrial materials outdoors that can be exposed to storm water, eroded by wind, and otherwise contaminate the surrounding watershed.

68.     Based on EDEN's investigation, including a review of the Facility's Notice of Intent to Comply with the Terms of the Industrial General Permit ("NOI"), SWPPP, aerial photography, Federal, State, and local regulatory agency mapping tools, and EDEN's information and belief; storm water is collected and discharged through seven storm drain inlets spread throughout two distinct drainage areas located within the boundaries of the Facility's two-acre site. These drainage areas are discharging storm water to two separate outfalls; Outfalls A and B.

69.     The outfalls discharge storm water and pollutants contained in that storm water directly into the City's MS4 system through Outfalls A and B, and to Sherman Lake and Morrison Creek by surface flow.  The Facility's stormwater runoff eventually makes its way to the Lower Sacramento River, a flowing and navigable waterway of the United States.

70.     Plaintiff is informed and believes, and thereupon alleges, that the storm water flows over the surface of the Facility where industrial activities occur; and, to areas where airborne materials associated with the industrial processes at the Facility may settle onto the ground.   Plaintiff is informed and believes, and thereupon alleges that storm water flowing

over these areas collects suspended sediment, dirt, metals, and other pollutants as it flows towards the storm water channels.

71.     On information and belief, Plaintiff alleges that there are insufficient structural storm water control measures installed at the Facility.  Plaintiff is informed and believes, and thereupon alleges, that current management practices at the Facility are inadequate to prevent the sources of contamination described above from causing the discharge of pollutants to the waters of the United States.

Deficient SWPPP and Site Map

72.     On information and belief, Plaintiff alleges that since at least March 1, 2017, Defendant has failed to implement an adequate SWPPP and Site Map for the Facility.

73.     Plaintiff is informed and believes, and thereupon alleges, that the Facility's SWPPP does not set forth site-specific Best Management Practices (BMPs) for the Facility that are consistent with BAT or BCT for this type of industry classification.

74.     Plaintiff is informed and believes, and thereupon alleges, that the Facility's SWPPP and Site Map do not comply with the requirements of Sections X(A), X(D), X(E), X(F), X(G), X(H) and XI of the General Permit, as is more particularly described in attached Exhibit "A".

75.     According to information available to EDEN, Defendant's SWPPP has not been evaluated to ensure its effectiveness and has not been revised where necessary to reduce further pollutant discharges. Plaintiff is informed and believes, and thereupon alleges, that the SWPPP does not include each of the mandatory elements required by the General Permit.

76.     Plaintiff is informed and believes, and thereupon alleges, that Defendant has failed and continues to fail to alter the Facility's SWPPP and site-specific BMPs consistent with the General Permit.

77.     In addition, Plaintiff alleges that Defendant ACM MACHINING's SWPPP fails to comply with Title 40, Subchapter N, of the Code of Federal Regulations.

78.     Information available to EDEN indicates that as a result of these practices, storm water containing excessive pollutants is being discharged during rain events into the Lower Sacramento River, including the pollutants of Iron, Aluminum, Zinc, Nitrates, Suspended Solids, pH affecting substances, Cadmium, Lead and Silver.

79.     Information available to Plaintiff indicates that Defendant has not fulfilled the requirements set forth in the General Permit for discharges from the Facility due to the continued discharge of contaminated storm water.  Plaintiff is informed and believes, and thereupon alleges, that all the violations alleged in this Complaint are ongoing and continuous.

Monitoring and Reporting

80.     On information and belief, EDEN alleges that ACM MACHINING has an inadequate monitoring program at its Facility.

81.     On information and belief, EDEN alleges that during the 2017-2018 reporting year, Defendants failed to collect and analyze two storm water samples from the first half of the reporting year and two storm water samples from the second half of the reporting year.

82.     On information and belief, EDEN alleges that during the 2018-2019 reporting year, Defendants failed to collect and analyze two storm water samples from the first half of the reporting year and two storm water samples from the second half of the reporting year.

83.     On information and belief, EDEN alleges that during the 2019-2020 reporting year, Defendants failed to collect and analyze two storm water samples from the first half of the reporting year and two storm water samples from the second half of the reporting year.

84.     On information and belief, EDEN alleges that during the 2020-2021 reporting year, Defendants failed to collect and analyze two storm water samples from the first half of the reporting year and two storm water samples from the second half of the reporting year.

85.     On information and belief, EDEN alleges that during the 2021-2022 reporting year to date, Defendants failed to collect and analyze any storm water samples at its Facility.

86.     On information and belief, EDEN alleges that Defendants have failed to conduct monthly visual observations of storm water discharges at the Facility since at least March 1, 2017.

87.     EDEN is informed and believes that Defendants have failed to analyze the Facility's storm water samples for all required parameters, in violation of Section XI(B)(6) of the General Permit.  Specifically, Section V(B) of the General Permit requires additional sampling parameters of Cadmium, Lead and Silver for all Metal Finishing Facilities, a requirement of 40 CFR Section 433.13.   Since at least March 1, 2017, Defendants have failed to sample for the required analytical parameters of Cadmium, Lead and Silver.

88.     EDEN is informed and believes that Defendants have failed to upload Facility storm water sample analyses within 30 days of obtaining the result for the sampling event, in violation of Section XI(B)(11) of the General Permit.  Specifically, Defendants failed to upload into SMARTS within 30 days the following sample analyses for;  6/29/2017, 3/1/2018, 7/9/2018, 11/28/2018, 2/13/2019, 2/25/2019, 7/11/2019, 1/9/2020, 1/16/2020, 7/23/2020, 12/28/2020, 1/4/2021 and 5/26/2021.

89.     EDEN is further informed and believes that Defendants have failed to correctly test their stormwater runoff for the parameter of pH.  Specifically, the Facility's Chain of Custody forms attached to the laboratory data do not include the time that the test for pH was conducted, the testing method used, and the meter calibration date and time.  Further, ACM MACHINING entered Level 1 status for pH on July 1, 2018 and was required to use a calibrated pH meter to conduct its pH sampling test, which it failed to do.

<u>Falsification of Annual Reports</u>

90.     EDEN is informed and believes that Defendants have submitted falsified Annual Reports to the Regional Water Quality Control Board in violation of Sections XXI(L) and XXI(N) of the General Permit.

91.     Specifically, on July 9, 2018, July 11, 2019, July 13, 2020, and June 15, 2021, ACM MACHINING submitted its Annual Reports for the fiscal reporting years 2017-18, 2018-19, 2019-20 and 2020-21, respectively.  The Reports were signed under penalty of law by Defendant Phillip McWilliams.  Mr. McWilliams is the currently designated Legally Responsible Person ("LRP") for Defendant ACM MACHINING.

92.     All four of Defendants' Annual Reports included an Attachment for the purpose of explaining why, ACM MACHINING failed to sample the required number of Qualifying Storm Events during the reporting years for all discharge locations in accordance with Section XI.B of the General Permit. Mr. McWilliams certified in all four of the reports, under penalty of perjury, that the required number of samples for each of the reporting periods were not collected by the Facility because there were insufficient qualifying storm water discharges occurring during the reporting years and scheduled facility operating hours.

93.     However, records from the National Oceanic and Atmospheric Administration (NOAA) website/database confirm that during the fiscal reporting years 2017-18, 2018-29, 2019-20 and 2020-21, there were in fact sufficient Qualified Storm Events (QSEs) occurring near the Facility during or within 12 hours of the start of regular business hours to allow Defendant ACM MACHINING to collect the requisite number of samples, as delineated above.

94.     False exculpatory statements are proof of intent. Based on the foregoing, Plaintiff alleges that Defendant Phillip McWilliams intentionally submitted false statements on the Facility's 2017-18, 2018-19, 2019-20, and 2020-21 Annual Reports when he asserted that there were insufficient QSEs for collection and analysis during the reporting years.

Failure to Implement BAT/BCT and BMPs

95.     EDEN is informed and believes that ACM MACHINING has failed to identify and implement Best Management Practices ("BMPs") at its Facility that comply with the requirements of the General Permit for best conventional treatment (BCT) for conventional pollutants, and best available technology (BAT) for toxic and non-conventional pollutants. These technology-based pollution controls are required to be implemented in a manner that reflects best industry practices, considering technological availability and economic practicability and achievability.  *See* General Permit §§ I(C), V(A).

96.     For example, the Regional Water Board inspected the Facility on January 8, 2018, and noted a failure to implement proper BMPs, including, a significant amount of steel and other scrap metals stored outdoors and exposed to rainfall. An oily sheen was observed flowing towards the drop inlet located near the southwest corner of the Facility. Uncovered bins containing metal shavings and compressed shavings pucks were observed exposed to

rainfall on the south end of the Facility, and cutting fluid from one of the bins was observed to be leaking onto the ground.

97.     Attached hereto as Exhibits "B" and "C" are recent photographs depicting Defendant ACM MACHINING's deficient BMPs, including copious amounts of scrap metal stored outdoors without any cover and exposed to the elements.

98.     Information available to EDEN indicates that as a result of these practices, storm water containing excessive pollutants is being discharged during rain events from the Facility to the Lower Sacramento River.

Discharges of Contaminated Storm Water

99.     Information available to EDEN indicates that unauthorized non-storm water discharges occur at the Facility due to inadequate BMP development and/or implementation necessary to prevent these discharges.

100.     Due to the nature of operations at the Facility, coupled with the documented lack of proper BMP implementation and unauthorized non-storm water discharges, Defendants are discharging storm water containing excessive levels of pollutants specific to their operation during every significant local rain event, at least.  These pollutants include Iron, Aluminum, Zinc, Suspended Solids, pH affecting substances, and potentially Lead, Cadmium and Silver.

101.     The Facility has reported numerous discharges in excess of narrative and numeric water quality standards established in the Basin Plan. These observations violate the narrative and numeric water quality standards established in the Basin Plan and therefore violate Discharge Prohibitions III(C) and III(D), along with Receiving Water Limitations VI(A) and VI(B) of the General Permit. Such observations evidence the ongoing violations of Effluent Limitation V(A) of the General Permit.

102.     The Facility has reported violations of the narrative water quality standards for discoloration, turbidity, and suspended solids contained in the Basin Plan.

103.     Specifically, the levels of Iron in storm water detected by the Facility have exceeded the standard established by the Basin Plan of 0.3 mg/L for Iron and the Secondary Maximum Contaminant Level ("SMCL") for Iron of 0.3 mg/L. For example, on November 28, 2018, the Iron level at the facility was measured at .54 mg/L. Defendant has also measured levels of Iron in excess of 0.54 mg/L in storm water discharged from the facility on January 8, 2018, March 1, 2018, February 13, 2019, January 16, 2020, and January 4, 2021.

104.     The levels of pH in storm water detected by the Facility have been outside the acceptable range of 6.5 – 8.5 SU established by the Basin Plan for pH, and outside the EPA benchmark numeric action limit for pH of 6.0 -- 9.0 SU.  For example, on January 8, 2018, the level of pH measured from one of the Facility's storm water outfalls was 9.4 SU.  Defendant also has measured levels of pH outside of the range of 6.0 – 9.0 SU in storm water discharged from the Facility on November 28, 2018, and the range or 6.5 -- 9.5 SU on February 25, 2019.

105.     Defendants have not collected or analyzed any storm water run-off since February 2, 2021.

<u>Failure to Comply with Required Exceedance Response Actions</u>

106.     On July 1, 2018, ACM MACHINING was elevated to Level 1 Status for exceedances of pH.

107.     Pursuant to Section XII of the General Permit, ACM MACHINING's Level 1 ERA Report was due to be prepared and uploaded into SMARTS by January 1, 2019.

108.     ACM MACHINING submitted its Level 1 ERA report late on February 21, 2019.  However, the Level 1 ERA Report is deficient in the following areas; it does not contain

an adequate summary of the Level 1 ERA Evaluation. And, it fails to include a discussion and evaluation of all the drainage areas. It does not identify industrial activity that is or may be contributing to the exceedances, nor does it identify SWPPP revisions or BMP improvements necessary to prevent future NAL exceedances to bring their Facility into compliance with the Storm Water Permit; all as more particularly detailed in Attachment "A" hereto.

Failure to Train Employees

109.    The General Permit requires all Facilities to designate a Legally Responsible Person ("LRP") to implement the requirements of the Permit. The LRP is responsible for appointing a Pollution Prevention Team and ensuring that the Team is properly trained in at least the following minimum requirements; BMP implementation, BMP effectiveness evaluations, visual observations, and monitoring activities.

110.    Defendants have failed to implement adequate BMPs at the Facility, have not conducted monthly visual observations, and have failed to comply with required storm water sampling and analysis.

111.    Further evidence of ACM MACHINING'S failure to train its employees is that Defendants' SWPPP fails to identify the Facility's Pollution Prevention Team--the employees of the Facility responsible for implementing the provisions of the General Permit.

**FIRST CAUSE OF ACTION**
**Failure to Prepare, Implement, Review, and Update**
**an Adequate Storm Water Pollution Prevention Plan**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

112.    Plaintiff re-alleges and incorporates all the preceding paragraphs as if fully set forth herein.

113.    The General Permit requires dischargers of storm water associated with industrial activity to develop and implement an adequate SWPPP.

114.     As outlined herein, Defendants have failed to develop and implement an adequate SWPPP for the Facility.

115.     Since March 1, 2017, each day that Defendants failed to develop, implement and update an adequate SWPPP for the Facility is a separate and distinct violation of the General Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), as to all Defendants.

**SECOND CAUSE OF ACTION**
**Failure to Develop and Implement an**
**Adequate Monitoring and Reporting Program**
**(Violation of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

116.     Plaintiff re-alleges and incorporates all the preceding paragraphs as if fully set forth herein.

117.     The General Permit requires dischargers of storm water associated with industrial activity to have developed and be implementing a monitoring and reporting program (including sampling and analysis of discharges) that complies with the terms of the General Permit.

118.     As outlined herein, Defendants have failed to develop and implement an adequate monitoring and reporting program for its Facility.

119.     Defendant ACM MACHINING's ongoing failure to develop and implement an adequate monitoring and reporting program are evidenced by its failure to collect storm water samples pursuant to the requirements of the General Permit.

120.     Since at least March 1, 2017, each day that Defendants have failed to develop and implement an adequate monitoring and reporting program for its Facility in violation of the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a), as to all Defendants. The absence of requisite monitoring and analytical results are ongoing and continuous violations of the Clean Water Act.

121.    Noncompliance with the General Permit constitutes a violation of the CWA, as to all Defendants. *See* General Permit § XXI.A. *See also* 33 U.S.C. § 1342.

### THIRD CAUSE OF ACTION
### Submission of False Annual Reports to the Regional Water Board
### (Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)

122.    Plaintiff re-alleges and incorporates all the preceding paragraphs as if fully set forth herein.

123.    Section XVI of the General Permit requires that Annual Reports submitted to SMARTS be certified under penalty of law, pursuant to Section XXI(L) which provides significant penalties for submitting false information.

124.    Specifically, Clean Water Act section 309(c)(4) and Section XXI(N) of the General Permit provide a maximum penalty for any person who knowingly makes a false material statement, representation, or certification in any record or other documents submitted or required to be maintained under the General Permit, including Annual Reports, of up to and including a fine of $10,000 and imprisonment of two years, or both.

125.    As delineated herein, Defendant ACM MACHINING's legally responsible person, Defendant Phillip McWilliams, made materially false representations in the Facility's Annual Report(s) for the reporting periods 2017-18, 2018-19, 2019-20 and 2020-21; saying that the Facility was unable to sample the required number of QSEs during the reporting year for all discharge locations because there were insufficient QSEs in the vicinity of the Facility during operating hours.

126.    In reality, there were sufficient QSEs during the reporting years, during operating hours, according to NOAA records; judicially noticeable rainfall was such that the Facility could have indeed collected the required number of samples.

127.    At the time that Defendant Phillip McWilliams made the false exculpatory statements referred to above, he knew that the representations were false, because there was in fact rain, during the reporting period and within 12 hours of the start of regular business hours for the Facility. Nevertheless, Mr. McWilliams proceeded to certify under penalty of law to the Regional Water Board that the information contained in the Annual Reports was true and correct.

128.    Since July 9, 2018, each time that Defendants submitted false statements to the Regional Water Board under penalty of perjury is a separate and distinct violation of the General Permit, and Section 301(a) of the Act, 33 U.S.C. § 1311(a), as to all Defendants.

**FOURTH CAUSE OF ACTION**
**Failure to Implement the Best Available and**
**Best Conventional Treatment Technologies**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

129.    Plaintiff re-alleges and incorporates all the preceding paragraphs as if fully set forth herein.

130.    The General Permit's SWPPP requirements and the Effluent Limitation V(A) of the General Permit, requires dischargers to reduce or prevent pollutants from entering their storm water discharges through implementation of BAT for toxic and nonconventional pollutants, and also BCT, for conventional pollutants.

131.    Defendants failed to implement BAT and BCT at the Facility for its discharges of Iron, Suspended Solids, Zinc, Nitrates, Aluminum, pH affecting substances, and other potentially un-monitored pollutants, in violation of Effluent Limitation V(A) of the General Permit.

132.    Since at least March 1, 2017, each day that Defendants have failed to develop and implement BAT and BCT in violation of the General Permit is a separate and distinct

violation of the General Permit, and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), as to all Defendants.

**FIFTH CAUSE OF ACTION**
**Discharges of Contaminated Storm Water**
**in Violation of Permit Conditions and the Act**
**(Violations of 33 U.S.C. §§ 1311, 1342)**

133.    Plaintiff re-alleges and incorporates all preceding paragraphs as if fully set forth herein.

134.    Discharge Prohibition III(C) of the General Permit prohibits storm water discharges and authorized non-storm water discharges that cause or threaten to cause pollution, contamination, or nuisance.  Receiving Water Limitation VI(B) of the General Permit prohibits storm water discharges to any surface or ground water that adversely impacts human health or the environment. Receiving Water Limitation VI(A) and Discharge Prohibition III(D) of the Permit prohibit storm water discharges that cause or contribute to an exceedance of any applicable water quality standards contained in the Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

135.    Plaintiff is informed and believes, and thereupon alleges, that since at least March 1, 2017, Defendant ACM MACHINING has been discharging polluted storm water from the Facility, in excess of applicable water quality standards in violation of Receiving Water Limitation VI(A) and Discharge Prohibition III(D) of the General Permit.

136.    During every rain event, storm water flows freely over exposed materials, waste products, and other accumulated pollutants at both facilities, becoming contaminated with Iron, sediment, Zinc, nitrates, Phosphorus and other un-monitored pollutants at levels above applicable water quality standards. The storm water then flows untreated into the Sacramento River.

137.    Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are causing or contributing to the violation of the applicable water quality standards in a Statewide Water Quality Control Plan and/or the applicable Regional Board's Basin Plan in violation of Receiving Water Limitations of the General Permit.

138.    Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are adversely affecting human health and the environment, in violation of Receiving Water Limitations of the General Permit.

139.    Since at least March 1, 2017, every day that Defendant ACM MACHINING has discharged and continues to discharge polluted storm water from its Facility in violation of the General Permit, they commit separate and distinct violations of Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), as to all Defendants.  These violations are ongoing and continuous.

**SIXTH CAUSE OF ACTION**
**Failure to Comply with Required Exceedance Response Actions**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

140.    Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

141.    The General Permit requires that all Dischargers who enter Level 1 or Level 2 status comply with specific Exceedance Response Actions delineated in Section XII of the General Permit.

142.    On July 1, 2018, ACM MACHINING entered Level 1 status for pH exceedances.

143.    As herein alleged, ACM MACHINING has failed to date to comply with the Exceedance Response Actions required by the General Permit.

144.    Each day since January 1, 2019, that Defendants have failed to comply with the Exceedance Response Actions required by the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a), as to all Defendants.

## SEVENTH CAUSE OF ACTION
**Failure to Properly Train Facility Employees and Pollution Prevention Team**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

145.    Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

146.    Section X(D)(1) of the General Permit requires each Facility to establish a Pollution Prevention Team who is then responsible for assisting with the implementation of the requirements of the General Permit. The Facility is also required to identify alternate team members to implement the SWPPP and conduct required monitoring when the regularly assigned Pollution Prevention Team members are temporarily unavailable (due to vacation, illness, out of town business, or other absences).

147.    Section X(H)(f) of the General Permit also requires that each facility ensure that all Pollution Prevention Team members implementing the various compliance activities of the General Permit are properly trained in at least the following minimum requirements: BMP implementation, BMP effectiveness evaluations, visual observations, and monitoring activities. Further, if a Facility enters Level 1 status, appropriate team members must be trained by a Qualified Industrial Storm Water Practitioner ("QISP").

148.    Since at least March 1, 2017, Defendants have failed to properly train Facility employees and the designated members of its Pollution Prevention Team, which has resulted in the General Permit violations alleged herein.

**RELIEF REQUESTED**

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment providing the following relief:

1.      Declare Defendants to have violated and to be in violation of the CWA;

2.      Issue an injunction ordering Defendants to immediately operate the Facility in compliance with the NPDES permitting requirements contained in the General Permit and the CWA;

3.      Enjoin Defendants from discharging pollutants from Defendant ACM MACHINING's Facility to the surface waters surrounding the Facility until such time as ACM MACHINING has developed and implemented an adequate SWPPP and implemented appropriate BMPs;

4.      Order Defendants to pay civil penalties of $56,460.00 per day/per violation for each violation of the Act pursuant to 33 U.S.C. §§ 1319(d), 1365(a) and 40 C.F.R. §§ 19.1, 19.2-19.4;

5.      Order Defendants to take appropriate actions to restore the quality of United States waters impaired by its activities at ACM MACHINING's Facility;

6.      Order Defendants to pay EDEN's reasonable attorneys' fees and costs (including expert witness fees), as provided by 33 U.S.C. § 1365(d) and applicable California law;

7.      Award Plaintiff additional attorney fees under California Code of Civil Procedure §1021.5, to the extent that Plaintiff's Notice of Intent to Sue directed to Defendants was the catalyst for Defendants' voluntary corrective action or cessation of the violations

included in Plaintiff's Notice, provided that Defendants undertook any such corrective action

after receiving Plaintiff's Notice, and;

      8.     Award such other and further relief as may be just and proper.

Dated: February 18, 2022               Respectfully,

                              By:   */S/Adam D. Brumm*_____
                                      Adam D. Brumm
                                      Attorney for Plaintiff



# EDEN

*Central Valley* **Eden Environmental Defenders**

September 10, 2021

<u>Via US Mail, Certified and Email</u>

Phillip McWilliams          Email:  pmcwilliams@acmmachining.com
ACM Machining
11390 Gold Dredge Way
Rancho Cordova, CA 95742

<u>Via US Mail</u>

Marline Balbach
Agent for ACM Machining
11390 Gold Dredge Way
Rancho Cordova, CA  95742

Alfred Balbach
ACM Machining, Inc.
11390 Gold Dredge Way
Rancho Cordova, CA  95742

**Re:      60-Day Notice of Violations and Intent to File Suit Under the Federal Water
             Pollution Control Act ("Clean Water Act")**

To Officers, Directors, Operators, Property Owners and/or Facility Managers of ACM
Machining:

         This letter is being sent to you on behalf of Central Valley Eden Environmental
Defenders, LLC ("EDEN") to give legal notice that EDEN intends to file a civil action against
ACM Machining, Inc. ("Discharger" or "ACM Machining") and its corporate officers and other
legally responsible parties for violations of the Federal Clean Water Act ("CWA" or "Act") 33
U.S.C. § 1251 *et seq.,* that EDEN believes are occurring at the ACM Machining facility located at
11390 Gold Dredge Wy in Rancho Cordova, California ("the Facility" or "the site").

---

1520 E. Covell Blvd #B5                    Telephone:  (530) 341-2467
Davis, CA  95616                           Email: <u>edenenvdefenders@gmail.com</u>

EDEN is an environmental citizen's group established under the laws of the State of California to protect, enhance, and assist in the restoration of all rivers, creeks, streams, wetlands, vernal pools, and tributaries of California, for the benefit of its ecosystems and communities.

As discussed below, the Facility's discharges of pollutants degrade water quality and harm aquatic life in the Facility's Receiving Waters, which are waters of the United States and are described in Section II.B, below.  EDEN has members throughout California.  Some of EDEN's members live, work, and/or recreate near the Receiving Waters and use and enjoy the Receiving Waters for surfing, kayaking, camping, fishing, boating, swimming, hiking, cycling, bird watching, picnicking, viewing wildlife, and/or engaging in scientific study.

At least one of EDEN's current members has standing to bring suit against ACM Machining, as the unlawful discharge of pollutants from the Facility as alleged herein has had an adverse effect particular to him or her and has resulted in actual harm to the specific EDEN member(s).

Further, the Facility's discharges of polluted storm water and non-storm water are ongoing and continuous.  As a result, the interests of certain individual EDEN members have been, are being, and will continue to be adversely affected by the failure of ACM Machining to comply with the General Permit and the Clean Water Act.

CWA section 505(b) requires that sixty (60) days prior to the initiation of a civil action under CWA section 505(a), a citizen must give notice of intent to file suit. 33 U.S.C. § 1365(b). Notice must be given to the alleged violator, the U.S. Environmental Protection Agency ("EPA"), and the EPA in the state in which the violations occurred or are occurring.

As required by CWA section 505(b), this Notice of Violation and Intent to File Suit provides notice to the Discharger of the violations which have occurred and continue to occur at the Facility.  After the expiration of sixty (60) days from the date of this Notice of Violation and Intent to File Suit, EDEN reserves the right to file suit in federal court against ACM Machining under CWA section 505(a) for the violations described more fully below if this matter cannot be resolved.

## I.      THE SPECIFIC STANDARD, LIMITATION OR ORDER VIOLATED

EDEN's investigation of the Facility has uncovered significant, ongoing, and continuous violations of the CWA and the General Industrial Storm Water Permit issued by the State of California (NPDES General Permit No. CAS000001 [State Water Resources Control Board ("SWRCB")] Water Quality Order No. 2014-0057-DWQ as amended by Orders 2015-0122-DWQ and 2018-XXXX-DWQ (hereinafter "General Permit").

Information available to EDEN, including documents obtained from California EPA's online Storm Water Multiple Application and Reporting Tracking System ("SMARTS"), indicates that on or around November 9, 2012, ACM Machining first submitted a Notice of Intent ("NOI") to be authorized to discharge storm water from the Facility under the General Permit. The Facility reapplied for General Permit coverage under the 2014 Permit on February 25, 2015. ACM Machining's assigned Waste Discharger Identification number ("WDID") is 5S34I023914.

As more fully described in Section III, below, EDEN alleges that in its operations of the Facility, ACM Machining has committed ongoing violations of the substantive and procedural requirements of the Federal Clean Water Act, California Water Code §13377, et seq; the General Permit; the Regional Water Board Basin Plan; the California Toxics Rule (CTR); 40 C.F.R. Chapter I, Subchapter N, § 400, et seq.; and California Code of Regulations, Title 22, § 64431.

## II.     THE LOCATION OF THE ALLEGED VIOLATIONS

### A.   <u>The Facility</u>

The location of the point sources from which the pollutants identified in this Notice are discharged in violation of the CWA is ACM Machining's permanent facility address of 11390 Gold Dredge Way in Rancho Cordova, California.

ACM Machining is a facility that fabricates metal parts. Facility operations are covered under Standard Industrial Classification Code(s) (SIC) 3499 - Fabricated metal products, NEC and misc.

Based on the EPA's Industrial Storm Water Fact Sheet for industrial businesses with the SIC code of 3499, stormwater run-off discharges contain many pollutants on the list of chemicals published by the State of California known to cause cancer, birth defects, and/or developmental or reproductive harm, including toxic and heavy metals, pH affecting substances, total suspended solids, and various types of oil and grease, as well as zinc, N+N (Nitrates+Nitrites), iron and aluminum.

Information available to EDEN indicates that the Facility's industrial activities and associated materials are exposed to storm water, and that each of the substances listed on the EPA's Industrial Storm Water Fact Sheet is a potential source of pollutants at the Facility.

### B.   <u>The Affected Receiving Waters</u>

The Facility discharges into Morrison Creek and American River, tributaries of the Sacramento River ("Receiving Waters"). The Sacramento River is impaired for Group A Pesticides, Chlorpyrifos, Diazinon, Dieldrin, Dioxin compounds (including 2,3,7,8-TCDD), Furan Compounds, Mercury, Selenium, PCBs (Polychlorinated biphenyls) (dioxin-like), PCBs

(Polychlorinated biphenyls), Electrical Conductivity, DDT (Dichlorodiphenyltrichloroethane) and Chlordane.

The Sacramento River is a water of the United States.  The CWA requires that water bodies such as the Sacramento River meet water quality objectives that protect specific "beneficial uses." The Regional Water Board has issued its *Water Quality Control Plan for the Sacramento River Basin* ("Basin Plan") to delineate those water quality objectives.

The Basin Plan identifies the "Beneficial Uses" of water bodies in the region.  The Beneficial Uses for the Receiving Waters downstream of the Facility include: Municipal and Domestic Supply (MUN), Agricultural Supply (AGR), Industrial Process Supply (PRO), Industrial Service Supply (IND), Navigation (NAV), Water Contact Recreation (REC-1), Non-contact Water Recreation (REC-2), Warm Freshwater Habitat (WARM), Cold Freshwater Habitat (COLD), Wildlife Habitat (WILD), Migration (MIGR), and Spawning, Reproduction, and/or Early Development (SPWN).

A water body is impaired pursuant to section 303(d) of the Clean Water Act, 33 U.S.C. § 1313(d), when its Beneficial Uses are not being achieved due to the presence of one or more pollutants.  Polluted storm water and non-storm water discharges from industrial facilities, such as the Facility, contribute to the further degradation of already impaired surface waters, and harm aquatic dependent wildlife.

## III.    VIOLATIONS OF THE CLEAN WATER ACT AND GENERAL PERMIT

### A.    *Deficient SWPPP and Site Map*

ACM Machining's current Storm Water Pollution Prevention Plan ("SWPPP") and Site Map for the Facility are inadequate and fail to comply with the requirements of the General Permit as specified in Section X of Order No. 2014-0057-DWQ, as delineated below.

(a) The Site Map does not include the minimum required components for Site Maps as indicated in Section X.E of the General Permit, or the following components are inaccurate or incomplete:

1) an accurate depiction of storm water drainage areas within the facility boundary and portions of any drainage area impacted by discharges from surrounding areas;

2) the locations of sampling points, and sampling points which are representative of facility operations; and

3) locations and descriptions of structural control measures that affect industrial storm water discharges, authorized NSWDs and/or run-on.

(b) The SWPPP fails to include the **date of each SWPPP Amendment** (Section X.A.10);

(c) The SWPPP fails to include an appropriate discussion of all the **Industrial Materials** handled at the facility, including the locations where the materials are stored, received, shipped, and handled, and the quantities and handling frequency of the Industrial Materials (Sections X.A.3, X.F, X.G.1.a);

(d) The SWPPP fails to discuss in detail **Facility operations and all industrial processes** at the Facility, including manufacturing, cleaning, maintenance, recycling, disposal, and any other activities related to each industrial process; and the type, characteristics, and approximate quantity of industrial materials used in or resulting from the process. Areas protected by containment structures and the corresponding containment capacity are also required to be identified and described. (X.G.1.a);

(e) The SWPPP fails to include an adequate description of **Potential Pollutant Sources** and narrative assessment of all areas of industrial activity with potential industrial pollutant sources, including Industrial Processes, Material Handling and Storage Areas, Dust and Particulate Generating Activities, Significant Spills and Leaks, Non-Storm Water Discharges and Erodible Surfaces (Section X.G);

(f) The **Minimum Best Management Practices** (BMPs) as indicated in the SWPPP are insufficient and/or they do not comply with the minimum required categories as listed in the General Permit, which include Good Housekeeping, Preventive Maintenance, Spill and Leak Prevention and Response, Material Handling and Waste Management, Erosion and Sediment Controls, Employee Training Program and Quality Assurance and Record Keeping (Section X.H.1);

(g) The SWPPP fails to include an adequate **BMP Summary Table** summarizing each identified area of industrial activity, the associated industrial pollutant sources, the industrial pollutants and the BMPs being implemented (Section X.H.4 and X.H.5);

(h) The SWPPP fails to identify all **Non-Storm Water Discharges (NSWD**s) sources and drainage areas, including an evaluation of all drains (inlets and outlets) that identifies connections to the storm water conveyance system, and a description of how all unauthorized NSWDs have been eliminated (Section X.G.e);

(i) The SWPPP fails to include an appropriate **Monitoring Implementation Plan**, including **an identification of team members assigned to conduct monitoring**

**requirements**, a detailed and accurate description of all discharge locations, a discussion of Visual Observation procedures, justifications for alternative discharge locations, if any, procedures for field instrument calibration instructions, and an example Chain of Custody form to be used when handling and shipping water quality samples to the lab (Section X.I);

(j) The SWPPP fails to include an adequate discussion of the **Facility's Receiving Waters.** (Section XI.B.6.e, Section X.G.2.ix);

(k) The SWPPP fails to include an appropriate and complete discussion of **drainage areas and Outfalls** from which samples must be taken during Qualified Storm Events (Section XI);

(l) The SWPPP fails to identify whether the Facility is subject to 40 CFR Subchapter N ELGs; and

(m) The SWPPP fails to include in the SWPPP detailed information about its **Pollution Prevention Team** (Section X.D).

Failure to develop or implement an adequate SWPPP is a violation of Sections II.B.4.f and X of the General Permit.

### B. Failure to Develop, Implement and/or Revise an Adequate Monitoring and Reporting Program Pursuant to the General Permit

Section XI of the General Permit requires Dischargers to develop and implement a storm water monitoring and reporting program ("M&RP") prior to conducting industrial activities. Dischargers have an ongoing obligation to revise the M&RP as necessary to ensure compliance with the General Permit.

The objective of the M&RP is to detect and measure the concentrations of pollutants in a facility's discharge, and to ensure compliance with the General Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations. An adequate M&RP ensures that BMPs are effectively reducing and/or eliminating pollutants at the Facility, and it must be evaluated and revised whenever appropriate to ensure compliance with the General Permit.

1. Failure to Conduct Visual Observations

Section XI.A of the General Permit requires all Dischargers to conduct visual observations at least once each month, and sampling observations at the same time sampling occurs at a discharge location.

Observations must document the presence of any floating and suspended material, oil and grease, discolorations, turbidity, odor, and the source of any pollutants. Dischargers must document and maintain records of observations, observation dates, locations observed, and responses taken to reduce or prevent pollutants in storm water discharges.

EDEN believes that between October 1, 2016 and the present, ACM Machining has failed to conduct monthly and sampling visual observations pursuant to Section XI.A of the General Permit and to maintain contemporaneous written Visual Observation Reports confirming that visual observations were conducted.

2.   Failure to Collect and Analyze the Required Number of Storm Water Samples

In addition, EDEN alleges that ACM Machining has failed to provide the Regional Water Board with the minimum number of annual documented results of Facility run-off sampling as required under Sections XI.B.2 and XI.B.11.a of Order No. 2014-0057-DWQ, in violation of the General Permit and the CWA.

Section XI.B.2 of the General Permit requires that all Dischargers collect and analyze storm water samples from two Qualifying Storm Events ("QSEs") within the first half of each reporting year (July 1 to December 31), and two (2) QSEs within the second half of each reporting year (January 1 to June 30).

Section XI.C.6.b provides that if samples are not collected pursuant to the General Permit, a proper and accurate explanation must be included in the Annual Report.

As of the date of this Notice, ACM Machining has failed to upload into the SMARTS database system the required number of storm water run-off sample analysis for the reporting years 2016-2017, 2017-2018, 2018-2019, 2019-2020 and 2020-2021 and has not provided an adequate explanation for its failure to do so.

3.   Failure to Sample Correctly for the Parameter of pH

Pursuant to Section XI.C.2.c of the General Permit, Dischargers which enter Level 1 status for pH shall, in the subsequent reporting years, analyze for pH in accordance with 40 Code of Federal Regulations 136 (standard laboratory test methods) or by use of a calibrated portable instrument for pH.

Additionally, the Facility Chain of Custody forms do not include the times that pH was tested, the testing method used and the meter calibration date and time if applicable.

ACM Machining entered Level 1 status for pH on July 1, 2018. ACM Machining's laboratory reports for samples collected on the following dates evidence that it failed to comply with 40 Code of Federal Regulations 136 or use a calibrated portable instrument for pH.

| | |
|---|---|
| 2/6/2015 | 10/25/2016 |
| 11/2/2015 | 12/8/2016 |
| 12/3/2015 | 2/3/2017 |
| 3/7/2016 | 1/8/2018 |
| | |

4.  Failure to Upload Storm Water Sample Analyses within 30 Days

Section XI.B.11.a of the General Permit requires Dischargers to submit all sampling and analytical results for all individual or Qualified Combined Samples via SMARTS within 30 days of obtaining all results for each sampling event.

ACM Machining failed to upload into SMARTS within 30 days the following sampling and analytical results pursuant to Section XI.B.11.a of the General Permit:

| Sample Date | Date Uploaded into SMARTS |
|---|---|
| 10/25/2016 | 12/28/2016 |
| 12/8/2016 | 6/29/2017 |
| 2/3/2017 | 6/29/2017 |
| 3/1/2018 | 7/9/2018 |
| 11/28/2018 | 7/11/2019 |
| 2/13/2019 | 7/13/2020 |
| 2/25/2019 | 7/13/2020 |
| 1/9/2020 | 7/13/2020 |
| 1/16/2020 | 7/13/2020 |
| 12/28/2020 | 5/26/2021 |
| 1/4/2021 | 5/26/2021 |

C.  *Falsification of Annual Reports Submitted to the Regional Water Board*

Section XXI.L of the General Permit provides as follows:

**L. Certification**

Any person signing, certifying, and submitting documents under Section XXI.K above shall make the following certification:

*"I certify under penalty of law that this document and all Attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted. Based on my inquiry of the person or persons who manage the system or those persons directly responsible for gathering the information, to the best of my knowledge and belief, the*

*information submitted is, true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations."*

Further, Section XXI.N of the General Permit provides as follows:

**N. Penalties for Falsification of Reports**

Clean Water Act section 309(c)(4) provides that any person that knowingly makes any false material statement, representation, or certification in any record or other document submitted or required to be maintained under this General Permit, including reports of compliance or noncompliance shall upon conviction, be punished by a fine of not more than $10,000 or by imprisonment for not more than two years or by both.

On July 6, 2017, July 9, 2018, July 11, 2019, July 13, 2020 and June 15, 2021, ACM Machining submitted Annual Reports for the Fiscal Years 2016-2017, 2017-2018, 2018-2019, 2019-2020 and 2020-2021. Phillip McWilliams signed the Reports under penalty of law. Phillip McWilliams is the current Legally Responsible Person ("LRP") for ACM Machining.

The Annual Reports included Attachment 1 as an explanation for why ACM Machining failed to collect and analyze stormwater run-off during the required number of Qualifying Storm Events during the reporting years for all discharge locations, in accordance with Section XI.B. Phillip McWilliams certified in the Reports, under penalty of perjury, that the required number of stormwater samples were not collected by the Facility because [allegedly] there were insufficient qualifying storm water discharges during the reporting years and scheduled facility operating hours.

However, records from the National Oceanic and Atmospheric Administration (NOAA) website/database confirm that during the reporting years in question there were in fact sufficient Qualified Storm Events (QSEs) occurring near the Facility during or within 12 hours of the start of regular business hours to allow ACM Machining to have collected the requisite number of samples.

### D. *Deficient BMP Implementation*

Sections I.C, V.A and X.C.1.b of the General Permit require Dischargers to identify and implement minimum and advanced Best Management Practices ("BMPs") that comply with the Best Available Technology ("BAT") and Best Conventional Pollutant Control Technology ("BCT") requirements of the General Permit to reduce or prevent discharges of pollutants in their storm water discharge in a manner that reflects best industry practice, considering technological availability and economic practicability and achievability.

EDEN alleges that ACM Machining has been conducting industrial activities at the site without adequate BMPs to prevent resulting non-storm water discharges. Non-storm water discharges resulting from these activities are not from sources that are listed among the authorized non-storm water discharges in the General Permit, and thus are always prohibited.

ACM Machining's failure to develop and/or implement adequate BMPs and pollution controls to meet BAT and BCT at the Facility violates and will continue to violate the CWA and the Industrial General Permit each day the Facility discharges storm water without meeting BAT and BCT.

*Specific BMP Deficiencies*

On November 15, 2012, the Facility was inspected by Rich Muhl and Michael Fischer of the Regional Water Quality Control Board. During that inspection, they noted the following BMP deficiencies:

Staff observed a significant amount of metal, metal shavings and other metal stored outside exposed to storm water runoff. Staff also observed open barrels and dumpsters full of metal stored outside exposed to storm water. In the barrel storage area, staff observed, a significant leak flowing on the concrete. Some of the concrete surfaces onsite required sweeping and/or cleaning. The areas around many of the drain inlets also required cleaning

On May 22, 2013, the Facility was inspected by Rich Muhl and Michael Fischer of the Regional Water Quality Control Board. During that inspection, they noted the following BMP deficiencies:

Drain inlets were protected with incorrect drain inlet filter bags. A significant amount of metal and metal waste was stored outdoors and exposed to storm water runoff. Staff observed an unidentified liquid under one of the bins. Also, staff observed waste barrels stored outside in an area adjacent to the building that had an inadequate concrete containment wall on one side due to weep holes that drained to the parking lot and discharged to a drain inlet.

On December 6, 2013, the Facility was inspected by Rich Muhl and Michael Fischer of the Regional Water Quality Control Board. During that inspection, they noted the following BMP deficiencies:

During the inspection, staff observed a significant amount of unprocessed metal and metal shavings stored outside exposed to storm water runoff. Additional metal shavings were observed in uncovered metal bins near the loading dock area. Metal shavings were observed on the ground behind the bins and on the ground in the loading lock area. Board staff observed several drums labelled as hazardous waste sludge that were not covered or in containment and were exposed to storm water.

On December 8, 2016, the Facility was inspected by Michael Fischer of the Regional Water Quality Control Board.   During that inspection, Michael Fischer noted the following BMP deficiencies:

Relatively large amounts of raw materials (mainly steel) are still stored outdoors and not covered.  Some metals shavings were observed on the ground in several locations.  A drum of diesel fuel used to fuel a forklift was observed south of the building without adequate secondary containment.

On January 8, 2018, the Facility was inspected by Michael Fischer of the Regional Water Quality Control Board.   During that inspection, Michael Fischer noted the following BMP deficiencies:

Raw materials, mainly steel, are stored outdoors and exposed to rainfall.  A sheen was observed flowing towards the drop inlet located near the southwest corner of the Facility. Uncovered bins containing metal shavings or compressed shavings pucks were observed exposed to rainfall on the south end of the Facility.  Cutting fluid from one of the bins was observed leaking onto the ground.

### E.   *Discharges In Violation of the General Permit*

Except as authorized by Special Conditions of the General Permit, Discharge Prohibition III(B) prohibits permittees from discharging materials other than storm water (non-storm water discharges) either directly or indirectly to waters of the United States.  Unauthorized non-storm water discharges must be either eliminated or permitted by a separate NPDES permit.

Information available to EDEN indicates that unauthorized non-storm water discharges occur at the Facility due to inadequate BMP development and/or implementation necessary to prevent these discharges.

EDEN alleges that the Discharger has discharged storm water containing excessive levels of pollutants from the Facility to its Receiving Waters during at least every significant local rain event over 0.1 inches in the last five (5) years.

EDEN hereby puts the Discharger on notice that each time the Facility discharges prohibited non-storm water in violation of Discharge Prohibition III.B of the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

1.   Discharges in Excess of Receiving Water Limitations

In addition to employing technology based effluent limitations, the Industrial General Permit requires dischargers to comply with Receiving Water Limitations.  Receiving Water Limitations found in Section VI of the General Permit prohibit storm water discharges and authorized non-storm water discharges to surface water that adversely impact human health or the environment.

Discharges that contain pollutants in concentrations that exceed levels known to adversely impact aquatic species and the environment also constitute violations of the General Permit Receiving Water Limitation.

Applicable Water Quality Standards ("WQS") are set forth in the California Toxics Rule ("CTR") and the Regional Basin Plan.  Exceedances of WQS are violations of the Industrial General Permit, the CTR, the Basin Plan, any parameter included as an impairment for the Facility's Receiving Waters on the 303(d) listing, and any parameters identified by the Regional Water Board as parameters assigned a total maximum daily load (TMDL).

Industrial storm water discharges must strictly comply with WQS, including those criteria listed in the applicable Basin Plan.  (See *Defenders of Wildlife v. Browner*, 191 F.3d 1159, 1166-67 (9th Cir. 1999).)

The Basin Plan establishes WQS for the Sacramento River and its tributaries, including but not limited to the following:

• Waters shall not contain substances in concentrations that result in the deposition of material that cause nuisance or adversely affect beneficial uses.

• Waters shall not contain suspended material in concentrations that cause nuisance or adversely affect beneficial uses.

• Waters shall be free of changes in turbidity that cause nuisance or adversely affect beneficial uses.

•    All waters shall be maintained free of toxic substances in concentrations that are lethal to or that produce other detrimental responses in aquatic organisms.

• Surface waters shall not contain concentrations of chemical constituents in amounts that adversely affect any designated beneficial use.

60-Day Notice of Intent to Sue
ACM Machining
September 10, 2021
Page 13 of 21

Information available to EDEN indicates that the Facility's storm water discharges contain elevated concentrations of specific pollutants, as listed below.  These polluted discharges can be acutely toxic and/or have sub-lethal impacts on the avian and aquatic wildlife in the Receiving Waters.  Discharges of elevated concentrations of pollutants in the storm water from the Facility also adversely impact human health.  These harmful discharges from the Facility are violations of the General Permit Receiving Water Limitation.

The following discharges of pollutants from the Facility have violated Discharge Prohibitions of the General Permit and are evidence of ongoing violations of Effluent Limitations:

| Sample Collection Date | Outfall | Parameter | Sample Analysis Result* |
|---|---|---|---|
| **Reporting Year 2016-17** | | | |
| 10/25/2016 | Side B | Iron | 0.65 |
| | | | |
| 12/8/2016 | Side B | Iron | 0.53 |
| | | pH | 8.7 |
| 2/3/2017 | Back | pH | 8.8 |
| | | | |
| **Reporting Year 2017-18** | | | |
| 1/8/2018 | Side A | Iron | 0.31 |
| | | pH | 9.4 |
| | Side B | Iron | 0.35 |
| | | pH | 9.25 |
| 3/1/2018 | Side A | Iron | 0.78 |
| | Side B | Iron | 0.99 |
| | | | |
| **Reporting Year 2018-19** | | | |
| 11/28/2018 | Side A | Iron | 0.54 |
| | | pH | 9.1 |
| 2/13/2019 | Side B | Iron | 0.61 |

60-Day Notice of Intent to Sue
ACM Machining
September 10, 2021
Page 14 of 21

| Sample Collection Date | Outfall | Parameter | Sample Analysis Result* |
|---|---|---|---|
| 2/25/2019 | Side B | Iron | 0.3 |
| | | pH | 8.6 |
| | | | |
| **Reporting Year 2019-20** | | | |
| 1/16/2020 | Side A | Iron | 0.44 |
| | | | |
| **Reporting Year 2020-21** | | | |
| 1/4/2021 | Side A | Iron | 0.35 |
| | | | |

*All units are listed in milligrams per liter (mg/L), except pH, which is listed in pH units (SU)

Listed below are the EPA Benchmark numeric action levels associated with the parameters, as identified on ***Table 2 of the General Permit,*** as well as the Maximum Contaminant Levels (MCLs) listed in the ***California Code of Regulations, Title 22, Section 64431*** (Table 64431-A) and the Water Quality Control Plan ***(Basin Plan)*** for the ***California Regional Water Quality Control Board, Central Valley Regional, Fifth Edition*** (Revised May 2018), Basin Plan Table 3-1, Trace Element Water Quality Objectives.

| Parameter | EPA Benchmark Annual NAL | EPA Benchmark NAL instantaneous Value | CV BASIN PLAN Table 3-1 MCL value | CCR Title 22 Section 64431 |
|---|---|---|---|---|
| pH | N/A | >6 or <9 SU | >6.5 or >8.5 | N/A |
| Total Suspended Solids (TSS) | 100 mg/L | 400 mg/L | N/A | N/A |
| Oil & Grease | 15 mg/L | 25 mg/L | N/A | N/A |
| Zinc | .26 mg/L | N/A | .10 mg/L | N/A |
| Copper | .0332 mg/L | N/A | .0056 mg/L | N/A |
| Lead | .262 mg/L | N/A | N/A | .05 mg/L |
| Chemical Oxygen Demand (COD) | 120 mg/L | N/A | N/A | N/A |
| Biochemical Oxygen Demand (BOD) | 30 mg/L | N/A | N/A | N/A |

| Parameter | EPA Benchmark Annual NAL | EPA Benchmark NAL instantaneous Value | CV BASIN PLAN Table 3-1 MCL value | CCR Title 22 Section 64431 |
|---|---|---|---|---|
| Aluminum | .75 mg/L | N/A | N/A | 1.0 mg/L |
| Iron | 1.0 mg/L | N/A | .30 mg/L | N/A |
| Nitrate + Nitrate Nitrogen | .68 mg/L | N/A | N/A | 45 mg/L |
| Phosphorus | 2.0 mg/L | N/A | N/A | N/A |
| Ammonia | 2.14 mg/L | N/A | N/A | N/A |
| Magnesium | .064 mg/L | N/A | N/A | N/A |
| Arsenic | .064 mg/L | N/A | N/A | N/A |
| Cadmium | .0053 mg/L | N/A | .00022 mg/L | .01 mg/L9i |
| Nickel | 1.02 mg/L | N/A | N/A | N/A |
| Mercury | .0014 mg/L | N/A | N/A | N/A |
| Selenium | .005 mg/L | N/A | N/A | N/A |
| Silver | .0183 mg/L | N/A | .01 mg/L | .05 mg/L |

2. Potential Discharges in Excess of 40 CFR Subchapter N Effluent Limitation
   Guidelines; Potential Failure to Sample Stormwater for Mandatory Parameters

Pursuant to Section V.B of the General Permit, storm water dischargers from facilities
subject to storm water effluent limit guidelines ("ELGs") for dischargers subject to 40 Code of
Federal Regulations Chapter I, Subchapter N ("Subchapter N"), commencing with Section 405
shall not exceed their respective storm water ELGs.

As stated above, ACM Machining is a facility that fabricates metal parts, covered under
SIC Code 3499. Although it is unclear what all of ACM Machining industrial processes are
because of lack of detail in the Facility SWPPP, if the Facility is subject to the ELGs for metal
finishing, the Facility needs to be sampling for the additional parameters as shown in the table
below.

| Covered Industry | pH SU | TSS mg/L | O&G HEM | Cad-mium | Lead | Zinc | Silver | Phos (P) | BOD mg/L | Ammonia as N mg/L |
|---|---|---|---|---|---|---|---|---|---|---|
| Airports (Deicing) 40 CFR §449.10 | | | | | | | | | | 14.7 |
| Asphalt Plants 40 CFR §443.13 | 6-9 | 23 | 15 | | | | | - | - | - |
| Cement Manufacturing 40 CFR §411.32 | 6-9 | 50 | - | | | | | - | - | - |
| Fertilizer Manufacturing | 6-9 | 150 | | | | | | 105 | | |

| Covered Industry | pH SU | TSS mg/L | O&G HEM | Cad-mium | Lead | Zinc | Silver | Phos (P) | BOD mg/L | Ammonia as N mg/L |
|---|---|---|---|---|---|---|---|---|---|---|
| 40 CFR § 418.12 | | | | | | | | | | |
| Metal Finishing* 40 CFR §433.13 | 6-9 | 60 | 52 | .69 | .69 | 2.61 | .43 | | | |
| Metal Products & Machinery Oily Wastes** 40 CFR §438.12 | | 62 | 46 | | | | | | | |

**\*Metal Finishing** ELGs apply to any facility which performs any of the following metal finishing processes on any basis material:  Electroplating, Electroless Plating, Anodizing, Coating (chromating, phosphating, and coloring), Chemical Etching and Milling, and Printed Circuit Board Manufacture. (40 CFR §433.10)

**\*\* Metal Products & Machinery Oily Wastes** applies to **Oily Operations** conducted by any facility engaged in manufacturing, rebuilding or maintenance of metal parts, products or machines in use in the Metal Product & Machinery industrial sectors, which include: Aircraft [aircraft engines and engine parts], Bus and Truck [transit, passenger and courier services; local and long distance trucking with or without storage, motor vehicle parts & accessories], Electronic Equipment, Hardware [architectural & ornamental metal work, fabricated metal products, sheet metal work],  Miscellaneous Metal Products [miscellaneous fabricated metal work], Mobile Industrial Equipment [construction and farm machinery and equipment], Motor Vehicle [repair shops]; Railroad, Ships and Boats [transportation & repair]; or Stationary Industrial Equipment.  (40 CFR §438.1, Appendix A to Part 438)

**Oily Operations** means one or more of the following: abrasive blasting; adhesive bonding; alkaline cleaning for oil removal; alkaline treatment without cyanide; aqueous degreasing; assembly/disassembly; burnishing; calibration; corrosion preventive coating; electrical discharge machining; floor cleaning (in process area); grinding; heat treating; impact deformation; iron phosphate conversion coating; machining; painting-spray or brush (including water curtains); polishing; pressure deformation; solvent degreasing; steam cleaning; testing (e.g., hydrostatic, dye penetrant, ultrasonic, magnetic flux); thermal cutting; tumbling/barrel finishing/mass finishing/vibratory finishing; washing (finished products); welding; wet air pollution control for organic constituents; and numerous sub-operations within those listed in this paragraph. In addition, process wastewater also results from associated rinses that remove materials that the preceding processes deposit on the surface of the workpiece. (40 CFR §438.2(f))

## F. _Failure to Comply with Exceedance Response Action Requirements_

As of July 1, 2015, the date the current General Permit became effective, all Dischargers were in "Baseline status" for all parameters listed in Table 2 of the Permit.   (General Permit, Section XII.B.

### Level 1 ERA Evaluation and Report

Pursuant to Section XII.C of the General Permit, a Discharger's Baseline status for any given parameter changes to "Level 1 status" if sampling results indicate either an annual average or instantaneous NAL exceedance for that same parameter.

Level 1 status commences on July 1 following the Reporting Year during which the exceedance(s) occurred, and the Discharger enters the Exceedance Response Action ("ERA")

process.  The ERA process requires the discharger to conduct a Level 1 ERA Evaluation, with the assistance of a Qualified Industrial Storm Water Practitioner ("QISP"), of the industrial pollutant sources at the Facility that are or may be related to the NAL exceedance(s), by October 1 following commencement of Level 1 status.

The Level 1 ERA Evaluation must include the identification of the corresponding BMPs in the SWPPP, as well as any additional BMPs and SWPPP revisions necessary to prevent future NAL exceedances and to comply with the requirements of the General Permit.

Based upon the Level 1 ERA Evaluation, the Discharger is required to, as soon as practicable, but no later than January 1 following commencement of Level 1 status, prepare a Level 1 ERA Report.  (Section XII.C.2).  The Level 1 Report must be prepared by a QISP and must include a summary of the Level 1 ERA Evaluation, a detailed description of the necessary SWPPP revisions, and any additional BMPs for each parameter that exceeded an NAL.

The SWPPP revisions and additional BMP development and implementation must also be completed by January 1.  The Level 1 status discharger is required to submit via SMARTs the Level 1 ERA Report certifying that the Level 1 ERA Evaluation has been conducted, and necessary SWPPP revisions and BMP implementation has been completed.  The certification also requires the QISP's identification number, name, and contact information (telephone number, e-mail address) no later than January 1 following commencement of Level 1 status.

A Discharger's Level 1 status for a parameter will return to Baseline status if a Level 1 ERA Report has been completed, all identified additional BMPs have been implemented, and results from four (4) consecutive qualified storm events that were sampled subsequent to BMP implementation indicate no additional NAL exceedances for that parameter.

### Deficient Level 1 ERA Report

Based on the test results summarized above, ACM Machining was elevated to Level 1 Status for pH July 1, 2018, pursuant to Section XII.C – Exceedance Response Actions of the General Permit.

ACM Machining submitted a late Level 1 ERA Report on February 21, 2019.  However, the Level 1 ERA Report does not comport with the requirements of Section XII.C of the General Permit.

Specifically, the Level 1 ERA Report does not contain an adequate summary of the Level 1 ERA Evaluation allegedly conducted by NES, Inc. QISP Jason Wunschel on February 8, 2019. The Level 1 ERA Evaluation is required to include an analysis of all pollutant sources that are or

may be related to the NAL exceedance, an evaluation of all drainage areas, including an evaluation of currently deficient BMPs at the Facility; the identification of the corresponding SWPPP BMP that was developed for each NAL exceedances; the identification of additional BMPs required to prevent future NAL exceedances and comply with the Permit; and the identification of SWPPP revisions necessary to achieve compliance with the General Permit. (General Permit, Section XII.C.1.(a)-(c)).

Further, the Facility Level 1 ERA Report submitted on February 21, 2019 does not provide a detailed description of the necessary SWPPP revisions, including the specific citation and location of the revisions to the SWPPP, or identify BMPs that will *prevent* the NAL exceedances and achieve compliance with the General Permit.

The Level 1 ERA Report is further inadequate because although it notes that additional investigation and/or monitoring is necessary, and documents several SWPPP deficiencies, the SWPPP was not adequately revised to address these problems. Accordingly, the Level 1 ERA Report does not meet the requirements of Section XII(C) of the General Permit.

Specifically, Jason Wunschel states in the Level 1 ERA Report submitted on February 21, 2019, that pH exceedances are occurring because:

- Aerial deposition from neighboring cement manufacturing company because of large stockpiles and conveyors directly against the property line. Visible deposition was observed during the evaluation.
- The pH meter used for sample testing was not being calibrated beforehand as required by the IGP. Staff was trained in the calibration procedures.

The Level 1 report for pH is deficient because it does not address the true source of the measured pollutants. The Facility pH results remained elevated in samples after the calibration training as noted in the above exceedance tables.

Additionally, if aerial deposition were occurring from the neighboring cement manufacturing company, iron results in the following reporting years' samples would be elevated. Sampling shows that iron results were low during the 2018-2019, 2019-2020 and 2020-2021 reporting years, especially in comparison to previous years' results.

Based on the foregoing, ACM Machining has failed and continues to fail to conduct an adequate Level 1 status evaluation and has also failed to submit a Level 1 ERA Report that complies with the General Permit. As such, ACM Machining is in daily violation of the General Permit.

### G. *Failure to Properly Train Employees/Facility Pollution Prevention Team*

Section X.D.1 of the General Permit requires each Facility to establish a Pollution Prevention Team responsible for assisting with the implementation of the requirements of the General Permit. The Facility is also required to identify alternate team members to implement the SWPPP and conduct required monitoring when the regularly assigned Pollution Prevention Team members are temporarily unavailable (due to vacation, illness, out of town business, or other absences).

Section X.H.f of the General Permit also requires that each Facility ensure that all Pollution Prevention Team members implementing the various compliance activities of the General Permit are properly trained in at least the following minimum requirements: BMP implementation, BMP effectiveness evaluations, visual observations, and monitoring activities. Further, if a Facility enters Level 1 status, appropriate team members must be trained by a QISP.

Based on the foregoing violations, it is clear that ACM Machining has not properly established its Pollution Prevention Team, and has not adequately trained its Pollution Prevention Team, in violation of Sections X.D.1 and X.H.f of the General Permit.

ACM Machining may have had other violations that can only be fully identified and documented once discovery and investigation have been completed. Hence, to the extent possible, EDEN includes such violations in this Notice and reserves the right to amend this Notice, if necessary, to include such further violations in future legal proceedings.

## IV. THE PERSON OR PERSONS RESPONSIBLE FOR THE VIOLATIONS

The individuals and entities responsible for the alleged violations are ACM Machining, Inc., as well as its corporate officers and employees of the Facility responsible for compliance with the CWA.

## V. THE DATE, DATES, OR REASONABLE RANGE OF DATES OF THE VIOLATIONS

The range of dates covered by this 60-day Notice is October 1, 2016, to the date of this Notice. EDEN may from time to time update this Notice to include all violations which may occur after the range of dates covered by this Notice. Some of the violations are continuous in nature; therefore, each day constitutes a violation.

## VI. CONTACT INFORMATION

The entity giving this 60-day Notice is Central Valley Eden Environmental Defenders, LLC.

EDEN ENVIRONMENTAL DEFENDERS
1520 E. Covell Blvd, Suite B5
Davis, CA  95616

To ensure proper response to this Notice, all communications should be addressed to EDEN's Counsel, Hans W. Herb.

HANS W. HERB
Law Offices of Hans W. Herb
P.O. Box 970
Santa Rosa, CA  95402
Telephone: (707) 576-0757
Email:  hans@tankman.com

## VII.    RELIEF SOUGHT FOR VIOLATIONS OF THE CLEAN WATER ACT

CWA §§ 505(a)(1) and 505(f) provide for citizen enforcement actions against any "person," including individuals, corporations, or partnerships, for violations of NPDES permit requirements and for un-permitted discharges of pollutants.  33 U.S.C. §§ 1365(a)(1) and (f), §1362(5).

Pursuant to Section 309(d) of the Clean Water Act, 33 U.S.C. § 1319(d), and the Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4, each separate violation of the Clean Water Act subjects the violator to a penalty for all violations occurring during the period commencing five (5) years prior to the date of the Notice Letter.  **These provisions of law currently authorize civil penalties of $56,460.00 per day, for each violation occurring on or after November 2, 2015.**

In addition to civil penalties, EDEN will seek injunctive relief preventing further violations of the Clean Water Act pursuant to Sections 505(a) and (d), 33 U.S.C. § 1365(a) and (d), declaratory relief, and such other relief as permitted by law.

**Lastly, pursuant to Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d) and California Code of Civil Procedure §1021.5, EDEN will seek to recover its pre and post-litigation costs, including all attorneys' and experts' fees and costs incurred** (see *Southern California Alliance of Publicly Owned Treatment Works v. U.S. Environmental Protection Agency* (9th Cir. 2017) 853 F.3d 1076; *Vasquez v. State of California* (2008) 45 Cal.4th 243).

## VIII.    CONCLUSION

The CWA specifically provides a 60-day notice period to promote resolution of disputes. EDEN encourages ACM Machining's counsel to contact **EDEN's counsel** within 20 days of

receipt of this Notice to initiate a discussion regarding the violations detailed herein and how ACM Machining may resolve this matter without the necessity of litigation.  Please do not contact EDEN directly.

During the 60-day notice period, EDEN is willing to discuss effective remedies for the violations; however, if ACM Machining wishes to pursue such discussions in the absence of litigation, it is suggested those discussions be initiated soon so that they may be completed before the end of the 60-day notice period.  EDEN reserves the right to file a lawsuit if discussions are continuing when the notice period ends.

Sincerely,

EDEN ENVIRONMENTAL DEFENDERS

Copies to:

Michael Regan, Director, U.S. Environmental Protection Agency, regan.michael@epa.gov
Regional Administrator, U.S. EPA – Region 9
Sarah Rowan:  rowan.sarah@epa.gov  and Laurie Kermish:  kermish.laurie@epa.gov
Eileen Sobeck, State Water Resources Control Board, eileen.sobeck@waterboards.ca.gov
Mayumi Okamoto, State Water Board Office of Enforcement:  Mayumi.Okamoto@waterboards.ca.gov
California Water Boards Stormwater Program, stormwater@waterboards.ca.gov

# Exhibit B



Photo 1. Overview of the west side of the Facility.  Raw materials (steel) stored outdoors exposed to rainfall.



Photo 2. Drop inlet located on the west side of the Facility.  All Drop inlets observed with Ultra-Tech Ultra Drain metal-removing BMPs installed.



Photo 3. Drop inlet located near the southwest corner of the Facility.  Note the sheen flowing into the drop inlet.



Photo 4. Uncovered bins of metal shavings and compressed shavings pucks during a rain event.



Photo 5.  Cutting fluid from the shavings in the bin leaking onto the ground.



Photo 6. Drop inlet and exposed raw materials near the southeast corner of the Facility.

# Exhibit C



ACM Machining

11390 Gold Dredge Way   ACM M

Google Earth

© 2021 | Google

70 ft



ACM Machining

11390 Gold Dredge Way · ACM Machining

Google Earth

© 2021 Google

70 ft



ACM Machining

11390 Gold Dredge Way   ACM Machining

Google Earth

© 2021 Google

70 ft

N